E. MARTIN ESTRADA
United States Attorney
CAMERON L. SCHROEDER
Assistant United States Attorney
Chief, National Security Division
AARON FRUMKIN (Cal. Bar No. 308479)
Assistant United States Attorney
Cyber & Intellectual Property Crimes Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6799
    Facsimile: (213) 894-2927
    E-mail:    Aaron.Frumkin@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 24-00092-MWF |
|---|---|
| Plaintiff, | **GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT SCOTT RAUL ESPARZA** |
| v. | |
| SCOTT RAUL ESPARZA, | Hearing Date: July 15, 2024 |
| Defendants. | Hearing Time: 3:00 p.m.<br>Location:     Courtroom of the<br>              Hon. Michael W.<br>              Fitzgerald |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Aaron Frumkin, hereby files its Sentencing Position for defendant Scott Raul Esparza in the above-captioned case.

//
//
//
//

The Government's Sentencing Position is based upon the attached memorandum of points and authorities and attachment, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: July 1, 2024                Respectfully submitted,

                                           E. MARTIN ESTRADA
                                           United States Attorney

                                           CAMERON L. SCHROEDER
                                           Assistant United States Attorney
                                           Chief, National Security Division

                                                /s/
                                           AARON FRUMKIN
                                           Assistant United States Attorney

                                           Attorneys for Plaintiff
                                           UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Defendant Scott Raul Esparza ("defendant") and his co-administrator, Shamar Shattock,[1] ran a criminal enterprise designed around launching hundreds of thousands of cyber-attacks on behalf of thousands of customers.  These attacks victimized computers located across the United States and around the world.  Although the government has not identified the end-users behind the thousands of IP addresses that were victimized by defendant's service, the one identified victim in this case was a school district, which publicly reported experiencing serious disruptions to its system because of a cyber-attack defendant personally facilitated.

To profit from enabling cyber-crime on this massive scale, defendant and Shattock created the website Astrostress[.]com (hereinafter, "Astrostress").  Astrostress was a type of criminal web-based service called a "booter," which customers used to order illegal distributed denial of service ("DDoS") attacks on any victims they chose.  Defendant accomplished all of this by procuring and maintaining the computer infrastructure that enabled the DDoS attacks.  He also assisted with marketing the service and handling customer requests for assistance sent via the website.  Defendant provided direction to customers on how to most effectively conduct attacks against particular victims using his service.  Defendant also utilized his own service to conduct nearly 6,500 attacks against victims he chose.

Defendant did all of this knowing that his criminal service was

---

[1] Shamar Shattock is pending sentencing before this Court in *United States v. Shamar Shattock*, 22-cr-00581-MWF.

1

launching tens of thousands of illegal cyber-attacks, and further knowing that at least some of these attacks were causing actual damage to victims. Specifically, for example, defendant helped a customer attack schools and offices in the Baltimore County Public Schools network. That attack was publicly reported on Fox News later that same day in an article the customer shared with defendant to confirm that the attack had worked.

Further, after the FBI caused Astrostress.com to cease functioning, defendant called Shattock and left him a voicemail message in which he instructed Shattock to "clear" all his social media accounts "so nothing gets linked back to us." Defendant's conduct thus reflects a troubling combination of sophistication, obstruction, and a disregard for the rule of law. Taking into account the aggravating circumstances in defendant's case, while also factoring in his lack of prior criminal history and his expeditious acceptance of responsibility, the government respectfully submits that a below-guidelines sentence of 24 months is sufficient, but not greater than necessary, to reflect the seriousness of the crime and the significant harm caused by defendant's service, as well as to deter other profit-motivated cybercriminals and protect the American public from future crime.

**II. Factual Background**

For several years between 2019 and 2022, defendant, Shattock, and others conspired to run Astrostress, a booter website used by roughly 2,878 customers that facilitated for profit nearly 800,000 DDoS attacks against tens of thousands of victims. In March 2024, defendant pled guilty to conspiracy to commit unauthorized impairment of a protected computer, and unauthorized impairment of a protected

2

computer, in violation of 18 U.S.C. §§ 371 and 1030(a)(5)(A). Defendant admitted to the following in the plea agreement.  (Dkt. Nos. 9, 12).

Beginning sometime in 2019 and continuing until September 13, 2022, defendant operated and co-administrated Astrostress, a DDoS-for-hire (booter) service.  (Dkt. No. 9 ¶ 14.)  Booter services charge customers money in exchange for access to DDoS attack infrastructure, enabling them to conduct DDoS attacks against Internet-connected victims of a customer's choosing.  (*Id.*)  DDoS attacks refer to a type of computer attack in which multiple computers attempt to make connections through the Internet to a targeted computer at the same time.  (*Id.*)  The amount of Internet traffic generated by such an attack quickly overwhelms the capacity of the victim computer, resulting in the victim computer being unable to send, receive, or respond to commands.  (*Id.*)

Defendant's booter service, Astrostress, employed "amplification" attacks, which functioned as follows (Dkt. No. 24 (PSR) ¶ 19):  Internet-connected computers can generally send requests to other computers or servers on the Internet, asking for data to be sent back in response.  (*Id.*)  Certain very short requests, which contain very little data and thus require little bandwidth, when sent to certain vulnerable servers on the Internet, will return a very large amount of data in response.  (*Id.*)  Thus, the small request is "amplified" to generate a much larger bandwidth response.  (*Id.*)  Astrostress functioned by regularly running scans on the Internet that identified servers belonging to innocent third parties that could be abused to generate such amplified responses.  (*Id.* ¶ 20.)  Normally, these large responses would be returned to the

requesting computer – i.e., Astrostress's servers.  (*Id.*)  However, Astrostress was designed to allow customers to redirect the amplified traffic to their intended victims by "spoofing" the originating IP address, making it appear that the customer was sending a request from the victim's computer rather than from Astrostress's servers.  (*Id.*)  This spoofing resulted in large volumes of data being sent directly to victim computers in response to requests initiated by Astrostress's servers, enabling DDoS attacks on demand that would sever or "boot" the designated victim computers from the Internet.  (*Id.*)  Such DDoS attacks can impact not only the victim computer or website's connection to the Internet, but also any corresponding web-based functionality, including applications, that are hosted from the victim's IP address.

Astrostress offered customers various levels of subscriptions, depending on how many attacks they wanted to conduct and with what power, and customers were charged accordingly.  (Dkt. No. 9 ¶ 14.) Astrostress thus enabled defendant's co-conspirators worldwide to set up accounts and then use Astrostress's resources to direct DDoS attacks at victims around the world.  (*Id.*)  Among other things, defendant was responsible for procuring the attack servers that enabled Astrostress to function, and for maintaining those servers as customers regularly used the service.  (*Id.*)  Defendant also assisted Shattock with marketing Astrostress, and he hired a co-conspirator to assist with responding to support requests from customers of the service.  (*Id.*)  Defendant captured and posted numerous videos of himself using the service to conduct attacks.  (*See, e.g.*, Dkt. No. 1 (Information) at 4.  He also personally assisted customers with conducting attacks, including in one instance helping a customer to

4

attack the Baltimore County Public Schools network.  (*Id.* at 3.) After defendant assisted the customer, the customer sent him the below image, reflecting a Fox News article publicly reporting the damage caused by the successful attack:

> **FOX 5 NEWS**
>
> Officials tweeted that "This issue is originating outside of the BCPS network and the Department of Technology is working with our internet provider to resolve. We will provide an update once the issue is resolved."
>
> **Baltimore County Public S...** @BaltCoPS
>
> ALERT: Schools and offices are currently experiencing internet connection issues. This issue is originating outside of the BCPS network and the Department of Technology is working with our internet provider to resolve. We will provide an update once the issue is resolved.
>
> 9:56 AM · Feb 7, 2022
>
> Read the full conversation on Twitter
>
> ♡ 99   💬 Reply   ↑ Share
>
> Read 49 replies

In response, defendant replied: "so it is working."  (*Id.*)

Defendant did not own or have the rights to use the third-party computers he exploited to generate the amplified attack power made available via Astrostress, and he was aware that his many customers

5

were using the site to attack various victim computers that did not belong to those customers, and which the customers had no authorization to impair.  (Dkt. No. 9 ¶ 15.)  Defendant personally conducted nearly 6,500 attacks using his own service.  (*See id.*)

Finally, around September 2022, shortly after the FBI caused Astrostress to cease functioning, defendant called Shattock and left him a voicemail message in which he instructed Shattock to "clear" all his social media accounts "so nothing gets linked back to us." (*Id.*)

## III. Defendant's Applicable Guidelines Range

The government concurs with the guidelines calculations in the PSR:

| | | |
|---|---|---|
| Base Offense Level: | U.S.S.G. § 2B1.1(a)(1) | 6 |
| Specific Offense Characteristics: | | |
| Sophisticated Means | U.S.S.G. § 2B1.1(b)(10)(C) | +6 (increase to 12) |
| Conviction under § 1030(a)(5)(A) | U.S.S.G. § 2B1.1(b)(19) | +4 |
| Adjustments: | | |
| Leader/Organizer | U.S.S.G. § 3B1.1(a) | +4 |
| Obstruction of Justice | U.S.S.G. § 3C1.1 | +2 |
| Adjusted Offense Level: | | 22 |
| **Total Offense Level** | | **19** |

Although it is undisputed that defendant's service was used to attack tens of thousands of protected computers, and thus the offenses involved far more than ten victim computers, the government agrees with the PSR that the two-level increase under U.S.S.G. § 2B1.1(b)(2)(A)(i) (for offenses involving ten or more victims)

6

should not apply, because the government does not possess sufficient evidence of losses sustained by the victim computers resulting from the offenses, and therefore the victim computers cannot be counted as "victims" pursuant to U.S.S.G. § 2B1.1.

The government believes that each of the above-listed enhancements is appropriate for the reasons aptly described in the PSR.  Defendant also stipulated to each of these enhancements in the plea agreement except for the leader/organizer adjustment under U.S.S.G. § 3B1.1(a).  The PSR correctly applies that enhancement, because defendant led and organized criminal activity that involved five or more participants.  (*See* PSR ¶¶ 47-49.)  Defendant and Shattock co-administered Astrostress, along with a third-party customer support person.  Defendant designed and marketed Astrostress to attract paying customers, who would use the service for its sole intended purpose: to conduct DDoS attacks against victim computers around the world.  In this regard, defendant was successful.  In total, defendant's service attracted at least 2,878 customers who in fact conducted such attacks using Astrostress.  Defendant's conspiracy to damage protected computers thus involved each of these Astrostress customers as co-conspirators.  Defendant administered and profited from Astrostress for roughly four years.  During this time, defendant and Shattock had complete access to and control over the service's powerful attack functionality; defendant personally directed and advised customers who sought help using the service to ensure they were successful in conducting the attacks they desired; and defendant marketed and advertised his service, recording promotional videos demonstrating the service's capabilities while he

conducted his own attacks using the service.[2]  In sum, defendant both led and organized this conspiracy.

Provided that defendant continues to demonstrate acceptance of responsibility for the offense up to and including the time of sentencing, the government recommends a two-level reduction in the applicable guidelines level, pursuant to U.S.S.G. § 3E1.1, and hereby recommends and moves for an additional one-level reduction under that section.  Accordingly, the government concurs with the USPO's total offense level of 19 and concurs with the USPO's calculation of defendant's criminal history category, which is category I.  An offense level of 19 and criminal history category of I yields a guidelines range of 30 to 37 months.  For the reasons outlined below, the government recommends that the Court impose a sentence of 24 months' custody, along with a $200 special assessment.

**IV.   The Appropriate Sentence in Light of 18 U.S.C. § 3553(a)**

Almost all of the Section 3553(a) factors weigh in favor of a substantial sentence: the guideline range itself, which forms the starting point for the Court's consideration; the nature and circumstances of the offense and the characteristics of defendant; the need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; the need to afford deterrence; and the concern of protecting the public.  However,

---

[2] In this regard, defendant's role is not akin to that of a drug dealer, for example, in supplying an illegal product to a buyer. Here, defendant provisioned a sophisticated criminal service, which he both designed and maintained.  Throughout the conspiracy, he not only worked to ensure that the service continued to function, but also directed and instructed his co-conspirators regarding their use of the service, presumably with the goal of maximizing his own profit (by ensuring his customers remained satisfied and would continue paying to use the service).

8

defendant's lack of criminal history and expeditious acceptance of responsibility weighs in favor of a downward variance in this case.

### A. Nature and Circumstances of the Offense

The known scope, breadth, and duration of the defendant's scheme to launch cyber-attacks for profit warrants a substantial period of incarceration that adequately accounts for the widespread harm defendant intended to cause to victim computer systems all over the globe. Indeed, as detailed above, defendant's conduct over a roughly four-year period facilitated nearly 800,000 DDoS attacks that, among other things, targeted public educational services and stole bandwidth from innocent third parties. Defendant took full advantage of his administrative access to the service, launching nearly 6,500 attacks against various victims of his choosing.

Defendant helped to spread DDoS-ing to the masses. His service, Astrostress, required virtually no technical expertise and minimal cost to use, meaning any unsophisticated actor could cause harm with the click of a button. Indeed, Astrostress was used by at least 2,878 customers to conduct attacks. In situations where a given customer could not achieve their desired aim – shutting down a given website, or taking a given victim computer offline – defendant provided guidance and specific instruction to help the customer most effectively use his service. Given the critical significance of the Internet in modern life worldwide, from business and personal communications, to entertainment, to distance education, to home safety and medical necessity, it is no small thing to be dropped from accessing it – or even just to have service degraded. What is more, the increasing prevalence of Internet-based applications, which can also be disrupted or degraded when the host server is attacked,

reflects a new and very real danger to society posed by DDoS services such as defendant's. For example, hospitals and medical facilities rely on applications that can easily be disrupted by such attacks. So too can web applications such as public alert notification systems.

### B. The History and Characteristics of the Defendant

Defendant's crimes here do not reflect a mere momentary lapse of judgment. Defendant admitted to running Astrostress for roughly four years. He put substantial work into his service, as reflected by his persistent customer service and marketing efforts over the years. He went out of his way to facilitate his customers' criminal conduct using his service, directing and assisting them with creating the most effective attacks against their desired targets. He maintained lists of vulnerable servers so his attacks would work better and he could charge his customers for a viable product. He hired another co-conspirator to assist with responding to customer support requests. In total, this shows significant devotion to criminal activity, and a focus and channeling of substantial energy to a business of crime.

What is worse, as defendant's own communications underscore, he unquestionably knew that his conduct was illegal – and he appeared neither disturbed nor deterred by this knowledge. After the FBI caused Astrostress to cease functioning, and defendant had reason to suspect that his service was being investigated, defendant reached out to his co-administrator, Shattock, and urged him to delete evidence regarding their administration. This reflects a willingness to knowingly engage in criminal activity overlaid by a propensity for deception that is truly troubling.

In view of the seriousness of the defendant's sustained and willful conduct, defendant's characteristics weigh heavily in aggravation in this case and support a significant sentence. On the other hand, defendant has no criminal history, and this appears to be his first contact with law enforcement.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment, to Protect the Public, and to Afford Adequate Deterrence to Criminal Conduct

The seriousness of defendant's crimes is tempting to underestimate, as it does not involve violence or bodily harm, and the tens of thousands of victims involved are mostly nameless.[3] But defendant exploited vulnerabilities inherent in a system that every American relies on for their daily functioning. And he did so for profit and for his own enjoyment. Over years, he refined and advertised his service. He was not just a customer, someone who launched DDoS attacks at particular targets. He commodified this criminal conduct, and he made it possible for thousands of other, often less-skilled, criminals to attack victims all over the world. He taught others how to commit these crimes, and provided them with all of the tools they needed. The impact of this conduct is enormous. It affects not just individual victims, but the underpinnings of our Internet-based society and economy. Just punishment requires that defendant's sentence reflect this scope and scale.

Defendant's lack of respect for the law is reflected in his persistence, and further in his obstructive conduct. A significant

---

[3] Though the Baltimore County Public School's network is a notable exception.

11

sentence is fully warranted to address this fact.  As that conduct also illustrates, protection of the public and deterrence are especially relevant factors here.  In particular, deterrence of criminals beyond defendant is crucial in this context.  As this case illustrates, cybercriminals like defendant exploit the obscurity afforded by the Internet to evade detection – sometimes for many years.  Indeed, the vast majority of Internet-based crimes go unsolved and unpunished due to the tremendous resources it takes for law enforcement to pierce a cybercriminal's cloak of anonymity – as was the case here.  Accordingly, when someone like defendant is identified and apprehended, it is a rare and important opportunity to send a message to other cybercriminals that their crimes will be treated as serious, and that they will be punished accordingly.  This is especially true in the context of DDoS services, which bring cybercrime to the masses, as defendant's service did to nearly three thousand co-conspirator customers of Astrostress.  Such services are made possible by administrators like defendant, and it is incumbent on the justice system to disrupt this criminal economy by effectively disincentivizing others from filling defendant's shoes.

On the other hand, although defendant's conduct was persistent and he demonstrated brazen disrespect for the law in his obstructive behavior, defendant promptly accepted responsibility in this case, waiving indictment and agreeing to an efficient, pre-indictment resolution.  In large part because of this prompt acceptance of responsibility, and further because of defendant's lack of criminal history, the government submits that a below-guidelines sentence of 24 months' imprisonment strikes an appropriate balance between the seriousness and breadth of the offenses and the need to deter other

cybercriminals, on the one hand, and defendant's specific history and particular circumstances, on the other.

**V.   Conclusion**

For the reasons set forth above, the government respectfully requests that the Court impose a term of incarceration of 24 months. The government submits that this sentence is sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing set forth in 18 U.S.C. § 3553(a).